# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

<table>
<tr>
<td>
BRIAN LARA and TIMOTHY BACCO,<br>
individually and on behalf of all others<br>
similarly situated,<br><br>
<em>Plaintiffs</em>, <br><br>
v. <br><br>
KNORR-BREMSE AG; KNORR BRAKE<br>
COMPANY; NEW YORK AIR BRAKE<br>
CORPORATION; WESTINGHOUSE AIR<br>
BRAKE TECHNOLOGIES CORPORATION;<br>
and FAIVELEY TRANSPORT NORTH<br>
AMERICA INC.,<br><br>
<em>Defendants</em>.
</td>
<td>
Case No.    2:18cv942<br><br><br>
<strong>CLASS ACTION COMPLAINT AND<br>
JURY DEMAND</strong>
</td>
</tr>
</table>

Plaintiffs, individually and on behalf of a class of all those similarly situated (the "Class"), bring this civil antitrust action against Defendants Knorr-Bremse AG, Knorr Brake Company, New York Air Brake Corporation, Westinghouse Air Brake Technologies Corporation, and Faiveley Transport North America Inc. (collectively, "Defendants"), and allege based on personal knowledge, the investigation of their counsel, and on information and belief, the following:

## NATURE OF ACTION

1.      This class action challenges under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3 unlawful agreements between three of the world's largest rail equipment suppliers to restrain competition in the labor market in which they compete for employees.

2.      Specifically, during the Class Period (defined herein), Defendants Knorr-Bremse AG ("Knorr") and Westinghouse Air Brake Technologies Corporation ("Wabtec") and Faiveley Transport S.A., prior to its acquisition by Wabtec in November 2016, and certain of their subsidiaries, collectively agreed not to solicit, recruit, or hire each other's employees without

prior approval, or otherwise compete for employees (collectively, the "No-Poach Agreements" or the "No-Poach Conspiracy").

3.      The conspiratorial No-Poach Agreements had the effect of unlawfully allocating employees among Defendants, resulting in suppressed compensation, among other injuries, to U.S. workers. Despite the high demand for a limited supply of skilled employees who have the relevant technical and industry experience, the unlawful No-Poach Agreements substantially limited U.S. rail industry workers' access to better job opportunities, restricted their mobility, and deprived them of information useful in negotiating better terms of employment, including higher compensation.

4.      On April 3, 2018, the Antitrust Division of the United States Department of Justice (the "DOJ") announced that, while investigating the Faiveley Transport S.A. – Wabtec merger, it uncovered the No-Poach Agreements. The DOJ reached a settlement with Knorr and Wabtec, charging them with unlawfully agreeing to restrain competition in the labor market in which they compete for employees, a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] The DOJ confirmed that it will not seek restitution on behalf of employees who were injured by Defendants' No-Poach Agreements.[2]

## JURISDICTION AND VENUE

5.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by Plaintiffs and the Class and to secure equitable and injunctive relief against Defendants for violating Sections 1 and 3 of the Sherman Act (15 U.S.C.

---

[1] *See* Competitive Impact Statement, *United States v. Knorr-Bremse AG and Westinghouse Air Brake Technologies Corp.*, Case No. 18-cv-00747 (D.D.C. Apr. 3, 2018), ECF No. 3.
[2] *Id.* at 17.

§§ 1, 3). Plaintiffs and the Class also seek attorneys' fees, costs, and other expenses under federal law.

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and 28 U.S.C §§ 1331 and 1337.

7.      Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are doing business in, or transact business in this District.

8.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the Commonwealth of Pennsylvania, including contacts in furtherance of the conspiracy alleged herein.

9.      Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state.

10.     Defendants, directly or through their agents, engage in interstate commerce in the production, distribution, and sale of rail equipment and services related thereto in the United States.

## PARTIES

**A.      Plaintiffs**

11.     Plaintiff Brian Lara is an adult resident of Verona, Pennsylvania.  He worked for Wabtec from November 2011 to January 2017 as a skilled machinist machining component parts

- 3 -

for the assembly of various valve systems.  As a result of the conspiracy as alleged herein, Plaintiff Lara earned less compensation than he would have earned absent the alleged conspiracy.

12.     Plaintiff Timothy Bacco is an adult resident of Ligonier, Pennsylvania.  He worked for Wabtec from July 2000 to May 2018 in the assembly department and as a skilled machinist making locomotive brake cylinder parts.  As a result of the conspiracy as alleged herein, Plaintiff Bacco earned less compensation than he would have earned absent the alleged conspiracy.

**B.     Defendants**

13.     Defendant Knorr-Bremse AG ("Knorr") is a privately-owned German company with its headquarters in Munich, Germany. Knorr is a global leader in the development, manufacture, and sale of equipment for rail and commercial vehicle systems. In 2017, Knorr had annual revenues of approximately \$7.7 billion.[3] As of December 31, 2016, Knorr employed approximately 25,000 people worldwide.[4]

14.     Defendant Knorr Brake Company ("KBC") is a wholly-owned subsidiary of Knorr incorporated in Delaware with its headquarters in Westminster, Maryland. It manufactures train control, HVAC, braking, and door systems used on passenger rail vehicles. KBC is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

---

[3] *See* Press Release, Knorr-Bremse Group, *Knorr-Bremse posts record sales of EUR 6.24 bn in fiscal 2017* (Feb. 7, 2018), http://www.knorr-bremse.de/en/press/pressreleases/press_detail_39680.jsp.
[4] *See* Knorr-Bremse, *Connected: Facts and Figures*, 4 (Dec. 31, 2016), http://www.knorr-bremse.com/media/documents/press/publications_1/facts_figures/FirstSpirit_1490596240594F_F_EN_2016_V8.pdf .

15.     Defendant New York Air Brake Corporation ("NYAB") is a wholly-owned subsidiary of Knorr incorporated in Delaware with its headquarters in Watertown, New York. It manufactures railway air brakes and other rail equipment used on freight trains. NYAB is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

16.     Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec") is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania. Wabtec is a publicly-held company, listed on the New York Stock Exchange. With over 100 subsidiaries globally, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017.[5] It employs approximately 18,000 full-time employees.[6] It is an industry leader in the freight and passenger rail segments of the rail equipment industry, manufacturing and servicing products such as brake systems, positive train control systems, and new locomotives. Wabtec Passenger Transit is a business unit of Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications. It is based in Spartanburg, South Carolina. Wabtec Global Services is a business unit of Wabtec that offers maintenance, repair, and support services. It has several locations throughout the United States.

17.     Defendant Faiveley Transport North America ("Faiveley"), formerly a subsidiary of Faiveley Transport S.A., is now a wholly owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina. On November 30, 2016, Wabtec acquired majority ownership of Faiveley Transport S.A., which had been a French société

---

[5] *See* Wabtec Corp., *Wabtec Reports Results for 2017 4Q and Full Year, Issues 2018 Financial Guidance* (Feb. 20, 2018), https://www.wabtec.com/press-releases/8499/wabtec-reports-results-2017-4q-and-full-year-issues-2018-financial-guidance.
[6] *See* 2017 Form 10-K Westinghouse Air Brake Technologies Corporation, 9 (Dec. 31, 2017), https://www.wabtec.com/uploads/annual_report/2017%2010-K%20FINAL%20Filed%20on%202.26.18.pdf.

anonyme based in Gennevilliers, France for approximately $1.507 billion.[7] As of March 21, 2017, Wabtec owned 100% of the share capital and voting rights of Faiveley Transport S.A. Prior to the acquisition, Faiveley Transport S.A. was the world's third-largest rail equipment supplier behind Wabtec and Knorr. Faiveley Transport S.A. had employees in 24 countries, including at six U.S. locations. Faiveley develops, manufactures, and sells passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately $1.2 billion in 2016.[8] In the United States, Faiveley Transport S.A. conducted business primarily through Defendant Faiveley. Various Faiveley recruiting activities conducted prior to its acquisition by Wabtec are at issue in this complaint.

## FACTUAL ALLEGATIONS

**A.    The Market for Railway Components and Systems**

18.    Defendants Knorr and Wabtec have been making railway brake systems, and other rail car components, for over 100 years. They are the world's largest rail equipment suppliers. Defendants are each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications.

19.    According to one market observer, "Wabtec holds a dominant market share position in North America for the supply of technology to the rail industry. In some specific component segments, such as pneumatic braking systems, Wabtec is part of a strong duopoly along with Knorr Bremse."[9]

---

[7] *Id.* at 15.
[8] *Id.* at 24.
[9] *My Growth Portfolio: Adding Wabtec*, Seeking Alpha (May 6, 2015), https://seekingalpha.com/article/3145446-my-growth-portfolio-adding-wabtec.

20.     An April 2018 report from IBISWorld, a market research company, found that "The Train, Subway and Transit Car Manufacturing industry has high barriers to entry."[10]

21.     In addition to competing for customers, Defendants also compete with one another in the market for skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

22.     Because this is a highly concentrated industry with high barriers to entry, the No-Poach Agreements allowed Defendants to effectively and efficiently reduce competition in the market for skilled labor, thus causing damage to the employees of those companies by suppressing their wages, reducing their mobility, and decreasing their leverage in negotiating for better terms of employment.

**B.     Railroad Rolling Stock Manufacturing**

23.     Defendants and their subsidiaries are engaged, at least in part, in what the United States Bureau of Labor Statistics ("BLS") refers to as railroad rolling stock manufacturing.[11]

24.     According to BLS data from May 2017, approximately 22,290 people are employed in this sector of the economy nationwide.[12] Census data indicates that, as of the Third

---

[10] Robert Miles, *IBISWorld Industry Report 33651: Train, Subway & Transit Car Manufacturing in the US* (April 2018), https://clients1.ibisworld.com/reports/us/industry/default.aspx?entid=849 (Tab: "Competitive Landscape").

[11] *See, e.g.*, Office of Mgmt. and Budget, *North American Industry Classification System* (2017), 296, https://www.census.gov/eos/www/naics/2017NAICS/2017_NAICS_Manual.pdf ("This industry comprises establishments primarily engaged in one or more of the following: (1) manufacturing and/or rebuilding locomotives, locomotive frames and parts; (2) manufacturing railroad, street, and rapid transit cars and car equipment for operation on rails for freight and passenger service; and (3) manufacturing rail layers, ballast distributors, rail tamping equipment and other railway track maintenance equipment.").

[12] Bureau of Labor Statistics, *May 2017 National Industry-Specific Occupational Employment and Wage Estimates: NAICS 336500 – Railroad Rolling Stock Manufacturing*, https://www.bls.gov/oes/current/naics4_336500.htm (row: "All Occupations"). A government report on the railroad industry workforce, however, states that "[t]his number likely does not include all employees, for example those working for contractors such as Lockheed Martin, General Electric, or Siemens." *See infra* n. 16 at 14.

Quarter of 2017, 4,531 people were employed in railroad rolling stock manufacturing in Pennsylvania.[13]

25.     The April 2018 report from IBISWorld indicates that Pennsylvania has the highest concentration of employers in this sector, "an estimated 15.6% of industry establishments."[14]

26.     Yet this workforce is aging. Of the 4,531 people employed in this field in Pennsylvania, 1,338 are between the ages of 45 and 54, 1,303 are between the ages of 55 and 64, and 146 are 65 or older.[15] In other words, 61.5% of the workforce is 45 years old or older.

27.     This reflects larger trends across the rail industry. In October 2011, the Federal Railroad Administration ("FRA"), a division of the United States Department of Transportation, published a study of the workforce in the rail industry.[16] One of the FRA report's primary findings is that the industry faced a worker shortage caused by two primary factors: increased demand for railroad services and a diminishing supply of workers with the requisite education and experience. The report identified the issue of "knowledge transfer" from an "aging workforce" as "the largest workforce concern across the rail industry," along with attrition, retention, and diversity.[17] The FRA report warns that, "[a]s job market competition begins to

---

[13] *See* QWI Explorer, https://qwiexplorer.ces.census.gov (for "Geography Level," select "Pennsylvania"; for "Indicator," select "Emp – Beginning of Quarter Employment: Counts"; for "Industries," select "NAICS 4-digit Industries," then select "3365: Railroad Rolling Stock Manufacturing"). In Maryland, by contrast, only 407 people are employed in this industry, or approximately one tenth of the number in Pennsylvania.

[14] IBISWorld Report, *supra* n. 10 (Tab: "Products & Markets"). The data indicates that Maryland has 0.8% of industry establishments.

[15] QWI Explorer, *supra* n. 13.

[16] Fed. R.R. Admin., *Railroad Industry Modal Profile: An Outline of the Railroad Industry Workforce Trends, Challenges, and Opportunities* (2011), https://www.fra.dot.gov/eLib/details/L01294.

[17] *Id.* at 21.

rise, it will become challenging to find the needed quantities of properly trained personnel to fill the jobs vacated by the surge in retirements."[18]

28.     A section of the FRA report pertaining to "Manufacturers and Suppliers" identified the need for workers with increased levels of technical skill: "As more technology is infused into the railroad industry, the need for increased integration of components and technologies also increases. This is fueling an increase in nontraditional skill sets such as electrical engineering, Radio Frequency (RF) engineers and computer science disciplines."[19]

29.     A 2015 report from the National Cooperative Rail Research Program ("NCRRP"), sponsored by the FRA, similarly concluded that, "[t]he aging workforce is the largest concern to the rail industry."[20] For instance, it identified "challenges involved in recruiting and retaining qualified U.S. freight railroad employees to (1) replace the large number of employees who recently retired or who will be reaching retirement in the next several years and (2) meet the current and forecasted increase in demand for freight rail transportation service."[21] It explained that this dynamic represents a change from past experience: "In the past, there was an abundance of qualified, skilled workers for the industry. However, as technology continues to advance within locomotive and rail operations, more advanced and specific technical expertise is required in employees."[22]

---

[18] *Id.* at 4.
[19] *Id.* at 14.
[20] Nat'l Coop. Rail Research Program, *A Guide to Building and Retaining Workforce Capacity for the Railroad Industry* (2015), 11, http://nap.edu/21904.
[21] *Id.* at 1.
[22] *Id.* at 10.

30.     The FRA published an update in April 2016 which indicated that the aging workforce remained a primary concern for the industry.[23]

### C.     Defendants' Products and Services

31.     As the FRA and NCRRP Reports suggest, many of the products and services that Defendants offer require a workforce with highly specialized knowledge and relevant experience to design, manufacture, implement and service them.

32.     For example, while air brakes were once fairly simple, they now tend to be highly complex and integrated with multiple other systems within a rail car or train. Over the past decade, railroads have begun adopting electronically controlled pneumatic ("ECP") air brake systems which were, for a time, mandated by the United States government for certain trains. Defendants NYAB and Wabtec are the only manufacturers of ECP systems in the United States.[24]

33.     In 2008, Congress passed the Rail Safety Improvement Act, which required most freight and commuter trains to implement Positive Train Control ("PTC") systems and provided funding to help them do so.[25] PTC is "a set of highly advanced technologies designed to make . . . rail transportation . . . safer by automatically stopping a train before certain types of accidents occur."[26] Components of a PTC system include an "onboard" system, a "wayside

---

[23] Fed. R.R. Admin., *Railroad Industry Modal Profile: An Outline of the Railroad Industry Workforce Trends, Challenges and Opportunities*, 20 (April 2016), https://www.fra.dot.gov/eLib/details/L17406#p1_z5_gD_lRT_y2016_m4.
[24] Robbie Whelan, *New Rules are Big Brake for Two Rail Suppliers*, Wall St. Journal, May 1, 2015, https://www.wsj.com/articles/new-rules-are-big-brake-for-two-rail-suppliers-1430523524.
[25] Rail Safety Improvement Act of 2008, 49 U.S.C. §§ 20101 et seq. (2008).
[26] Assoc. of Amer. Railroads, *Freight Rail & Positive Train Control*, https://www.aar.org/article/freight-rail-positive-train-control/.

- 10 -

system," and a "back office server," each of which "requires highly complex technologies and information processing capabilities."[27]

34.    Wabtec[28] and Knorr[29] both have divisions that develop, manufacture and sell PTC systems or components for PTC systems.

### D.    Defendants Seek Job Candidates with Experience They Would Likely Obtain Working for Other Defendants

35.    When Defendants recruit potential employees, they routinely seek candidates with degrees in science, technology, engineering, and math ("STEM"), as well as experience in the railroad industry, including knowledge of relevant standards, systems and software.[30]

36.    For instance, as of the date of this Complaint, Wabtec is seeking a Senior Systems Engineer.[31] Among other qualifications, Wabtec is seeking a candidate with a BS in electrical engineering, computer science or computer engineering, "minimum 7 years of qualified engineering experience in rail," with "PTC experience a plus," "[s]ystems rail experience a plus," and "FRA Rules and CENELEC[32] experience a plus."

---

[27] Assoc. of Amer. Railroads, *Positive Train Control* (April 2018), https://www.aar.org/wp-content/uploads/2018/04/AAR-Positive-Train-Control.pdf.
[28] *See* Wabtec Corp., *Freight Segment: PTC, Signaling & Wayside Market*, https://www.wabtec.com/markets/freight-segment-ptc-signaling-wayside-market.
[29] *See* Knorr Brake Co., *Train Control and Monitoring Systems*, http://www.knorrbrakecorp.com/en/products/tcms/train_control_and_monitoring_systems.jsp.
[30] The No-Poach Conspiracy that the DOJ uncovered "primarily affected recruiting for project management, engineering, sales, and corporate officer roles and restricted each company from soliciting current employees from the other's company." Complaint ¶ 19, *United States v. Knorr-Bremse AG*, Case No. 1:18-cv-00747 (D.D.C. Apr. 3, 2018), ECF No. 1. Although the DOJ averred that the illegal agreement "primarily" affected this type of employee, Plaintiffs allege on information and belief that the illegal agreements extended more broadly, affecting a wide spectrum of employees who worked for Defendants.
[31] Wabtec Corp., *Senior Systems Engineer*, https://careers-wabtec.icims.com/jobs/3407/senior-systems-engineer/job.
[32] CENELEC is an international standard for railroad software. *See, e.g.*, "Standard: CENELEC - ÉN 50218," https://standards.globalspec.com/std/1678027/cenelec-en-50128 ("This European Standard specifies the process and technical requirements for the development of software for programmable electronic systems for use in railway control and protection applications.").

37.     As of the date of this Complaint, Wabtec is seeking a Senior Software Engineer to "design, develop and support real time embedded software applications for Positive Train Control products at Wabtec Railway Electronics (WRE)."[33] Among other qualifications, Wabtec is seeking a candidate with a BS in software engineering or computer science, "7+ years of work experience in a software development team," as well as "[r]ail experience" and "CENELEC experience."

38.     As of the date of this Complaint, Wabtec is seeking a Software Engineer, ADA.[34] Among other qualifications, Wabtec is seeking a candidate with a BS in software engineering, computer science, or electrical engineering, "3 to 7 years of work experience in a software development team," as well as "[r]ail experience" and "CENELEC experience."

39.     As of the date of this Complaint, Defendant Knorr Brake Company is seeking a Software Quality Assurance Engineer.[35] Required "[s]oftware [k]nowledge" for the position includes, "Network communication protocols used in Rail Vehicles." Required "[i]ndustry [e]xperience" for the position includes "[k]nowledge and practical understanding of electro-mechanical systems in passenger rail vehicles or similar equipment and principles, as applied to microprocessor controlled equipment" and "desirable" experience includes "[e]xperience with embedded control of rail vehicle equipment."

---

[33] Wabtec Corp., *Senior Software Engineer*, https://careers-wabtec.icims.com/jobs/3531/senior-software-engineer/job.

[34] Wabtec Corp., *Senior Software Engineer, ADA*, https://careers-wabtec.icims.com/jobs/3534/software-engineer%2c-ada/job.

[35] Knorr Bremse, *Software Quality Assurance Engineer*, https://knorr-bremse-ats.silkroad.com/epostings/index.cfm?fuseaction=app.jobinfo&jobid=306105&source=ONLINE&JobOwner=1013203&company_id=15596&version=3&byBusinessUnit=NULL&bycountry=0&bystate=0&byRegion=&bylocation=&keywords=&byCat=&proximityCountry=&postalCode=&radiusDistance=&isKilometers=&tosearch=yes&city=.

40.     As of the date of this Complaint, Defendant Knorr Brake Company is seeking a
Systems Sales Engineer.[36] Required educational background is a degree in mechanical
engineering, electrical engineering, mathematics, or "similar discipline." Required "[i]ndustry
[e]xperience" includes, "[k]nowledge and practical understanding of TCMS (Train Control and
Monitoring System) or similar equipment."

41.     As of the date of this Complaint, Defendant NYAB is seeking a Software
Engineer.[37] Preferred experience includes, "[e]xperience in [r]ail or transportation systems
software development."

42.     As the above job listings indicate, there is high demand for employees with the
relevant industry and technical experience and a limited supply of employees with the requisite
skill. As a result, firms in the rail industry can experience vacancies of critical roles for months
while they try to recruit and hire an individual with the requisite skills, training, and experience
for a job opening.

43.     During the Class Period, Defendants could and should have recruited such
candidates from each other. Yet by entering the No Poach Conspiracy, Defendants refused to do
so, with the intent and effect of unlawfully suppressing the salaries of these employees.

---

[36] Knorr Bremse, *Systems Sales Engineer*, https://knorr-bremse-
ats.silkroad.com/epostings/index.cfm?fuseaction=app.jobinfo&jobid=305869&source=ONLINE&JobOwner=10132
03&company_id=15596&version=3&byBusinessUnit=NULL&bycountry=0&bystate=0&byRegion=&bylocation=
&keywords=rail&byCat=&proximityCountry=&postalCode=&radiusDistance=&isKilometers=&tosearch=yes&city
=.
[37] NYAB, *Software Engineer*; https://nyab-
openhire.silkroad.com/epostings/index.cfm?fuseaction=app.jobinfo&jobid=264&source=ONLINE&JobOwner=992
273&company_id=17275&version=1&byBusinessUnit=NULL&bycountry=0&bystate=0&byRegion=&bylocation=
NULL&keywords=&byCat=&proximityCountry=&postalCode=&radiusDistance=&isKilometers=&tosearch=yes&
city=.

1.     **Defendants Acted Against Self-Interest by Agreeing to Refrain from Cold Calling Each Other's Employees**

44.     In a competitive labor market, Defendants and their subsidiaries would compete with one another, as well as with firms at other tiers of the rail industry supply chain, to attract, hire, and retain skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment. In addition to online job postings like those referenced above, firms in the rail equipment industry employ a plethora of recruiting techniques, including using internal and external recruiters to identify, solicit, and otherwise assist in hiring potential employees.

45.     Directly soliciting or "cold calling" employees of another rail equipment industry participant is a particularly efficient and effective hiring method, because employment by one of the other competitors in this concentrated, insular market is a reliable indicator that an employee possesses the requisite qualifications. Cold calling allows a company to save costs and mitigate risk by taking advantage of the efforts its rival has expended in soliciting, interviewing, and training employees.

46.     The fact that skilled employees are in high demand but short supply in the rail industry should improve their compensation and other terms of employment. The illegal No-Poach conspiracy, however, prevented these ordinary labor market dynamics from functioning.

47.     If each Defendant were acting in its own independent self-interest, it would solicit the others' employees, including through offers of increased employment benefits and pay. But the Defendants acted against self-interest and instead entered into an anticompetitive conspiracy that imposed an artificial restraint on the demand for the employees' services.

48.     The No-Poach Conspiracy denied American rail industry workers access to better job opportunities, restricted their mobility, and deprived them of competitively significant

information that they could have used to negotiate for better terms of employment. Moreover, these No-Poach Agreements disrupted the efficient allocation of labor that comes from competing for employees.

      **E.**    **Defendants Are Highly Profitable**

49.    Defendants reported strong profits throughout the class period.

50.    Wabtec has reported net income of over $250 million per year on sales of $2.5 – 3.9 billion for the past 5 years:

**Wabtec Net Income[38]**

|  | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|
| Net Sales | $3,882 | $2,931 | $3,308 | $3,044 |
| Net Income | $262 | $305 | $399 | $352 |

51.    Wabtec's strong market position contributes to its financial success. Gross margins "improved from 25% in 2005 to almost 31% in 2014. More impressive, operating margins have almost doubled from 9.8% in 2005 to almost 17.3% in 2014. Improvements reflect significant pricing strength, and operating leverage in the business."[39]

52.    Knorr-Bremse has reported operating profits of over $640 million per year on sales of $6.1 – 7.3 billion for the past 4 years:

**Knorr-Bremse Net Income[40]**

|  | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|
| Net Sales | $7,269 | $6,404 | $6,796 | $6,068 |
| Net Income | $676 | $641 | $752 | $653 |

---

[38] Wabtec 2017 10-K, *supra* n. 6, at 22. Figures are in millions.
[39] Seeking Alpha, *supra* n.9.
[40] Knorr-Bremse, Annual Report 2017, at 2, http://www.knorr-bremse.com/media/documents/group/ff_annual_reports/annual_report_2017/Knorr-Bremse_Annual_Report_2017.pdf. Figures are in millions.

53.     Prior to its acquisition by Wabtec, Faiveley had annual sales of approximately $1.2 billion.[41]

54.     The April 2018 IBISWorld report indicates an optimistic outlook for Train, Subway and Transit Car Manufacturing in the United States.[42] IBISWorld projects increasing demand and annual growth of 7.2% per year from 2018 to 2023.[43]

### F.     Conferences and Trade Association Meetings Offered Defendants Routine Opportunities to Conspire

55.     On information and belief, one way that employees of Defendants, including top executives, interact is at meetings of the railroad industry's many trade associations.

56.     Several Defendants, for instance, are members of the Railway Supply Institute ("RSI"), a Washington, D.C.-based organization that bills itself as "[t]he only all-inclusive trade association for railway suppliers."[44] The RSI states that its "mission" is to "support, connect and advocate for railway suppliers."[45] Jason Connell of NYAB is currently the Secretary-Treasurer of RSI.[46] Jeff Stearns of Defendant Wabtec Corp.[47] and Janice Pfeil of NYAB are members.[48] As recently as last year, Stearns was also a director.[49] Jim Frantz, the President of Wabtec's Freight Services Group, is the immediate past president of the RSI.[50]

---

[41] Wabtec 2017 10K, *supra* n.6, at 24.
[42] IBISWorld Industry Report, supra n. 10 (Tab, "Industry Outlook").
[43] *Id.*
[44] Railway Supply Institute, *About Us*, http://www.rsiweb.org/about-us.
[45] *Id.*
[46] Railway Supply Institute, *Board of Directors*, http://www.rsiweb.org/board.
[47] Railway Supply Institute, *RSI On Track: Overview & Member Supplier Guide* (2016/2017), 39, http://www.rsiweb.org/files/2016-17.pdf.
[48] *Id.* at 33.
[49] *Id.* at 4.
[50] RSI Board of Directors, *supra* n. 46.

57.     RSI holds an annual conference called the RSI/CMA Rail Expo & Technical Conference.[51] NYAB and Wabtec are both exhibitors at the upcoming 2018 conference.[52] NYAB and Graham-White, then a subsidiary of Defendant Faiveley Transport North America, were exhibitors at the 2016 conference.[53]

58.     The Air Brake Association is another trade association to which Defendants belong. Wabtec, NYAB and RSI are three of the ABA's seven sponsors.[54]

59.     Railway Interchange bills itself as "the largest combined railway exhibition and technical conference in North America."[55] Speakers at the 2017 conference included Bill Gallagher, Regional Sales Manager for KBC; Jim Frantz, President of Wabtec's Freight Services Group; and Edward Gaughan of Wabtec. NYAB, Wabtec and United Wagon Company (a Russian corporation which runs a joint venture with Wabtec) were exhibitors at the 2017 conference.[56]

60.     InnoTrans bills itself as "the leading international trade fair for transport technology and takes places [sic] every two years in Berlin."[57] This year's conference is due to occur September 18-21, 2018, and exhibitors include Faiveley Transport,[58] at least two different Knorr entities,[59] and Wabtec.[60]

---

[51] Railway Supply Institute, *RSI/CMA 2018 Rail Expo & Technical Conference*, http://www.rsiweb.org/rsicma18.
[52] Railway Supply Institute, *RSI/CMA 2018 Rail Expo & Technical Conference: Expo Hall/Exhibitor List*, https://s15.a2zinc.net/clients/rsi/rsicma2018/Public/EventMap.aspx?shMode=E.
[53] Railway Supply Institute, *RSI/CMA 2016 Rail Expo & Technical Conference: Expo Hall/Exhibitor List*, http://s15.a2zinc.net/clients/RSI/RSICMA2016/Public/eventmap.aspx?shmode=E.
[54] Air Brake Association, http://www.airbrakeassociation.org/.
[55] Railway Interchange, http://railwayinterchange.org/.
[56] Railway Interchange, 2017 RSI Floor Plan, http://s15.a2zinc net/clients/RSI/RI2017/Public/EventMap.aspx.
[57] InnoTrans, *In Brief*, https://www.innotrans.de/en/AtAGlance/Overall/.
[58] InnoTrans, *Exhibitors*, 9, https://www.virtualmarket.innotrans.de/en/search?view=2&itemtype=company&page=9.
[59] *Id.* at 15.
[60] *Id.* at 29.

- 17 -

61.     These trade associations and conferences have provided and continue to provide regular opportunities for Defendants to share information and otherwise carry out the No-Poach Conspiracy.

###     G.     The No-Poach Conspiracy

62.     Beginning almost a decade ago, Wabtec, Knorr, and Faiveley entered into No-Poach Agreements wherein they conspired with each other to eliminate competition among themselves for employees. These agreements were executed and enforced by senior company executives and implemented throughout the companies' U.S. subsidiaries. The No-Poach Agreements were not reasonably necessary to any separate, legitimate business transaction or legitimate collaboration between the companies and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

63.     Defendants intended the No-Poach Conspiracy to suppress compensation and reduce employment mobility for their employees, and it has.

###     1.     The Wabtec-Knorr Agreement

64.     Wabtec and Knorr entered into pervasive No-Poach Agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into No-Poach Agreements that involved promises and commitments not to solicit or hire one another's employees. These No-Poach Agreements primarily affected recruiting for project management, engineering, sales, and corporate officer roles and restricted each company from soliciting current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

65.     Beginning no later than 2009, Wabtec's and KBC's most senior executives entered into express No-Poach Agreements and thereafter actively managed those agreements through direct communications. For example, in a letter dated January 28, 2009, a director of KBC wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent case for both companies. As you so accurately put it, 'we compete in the market.'"[61] This agreement was known to senior executives at Knorr and Wabtec, including top Knorr executives in Germany, who were included in key communications regarding the No-Poach Agreement.[62] In furtherance of their agreement, Wabtec and KBC informed their outside recruiters not to solicit employees from the other company.[63]

66.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' No-Poach Agreement. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited a KBC employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing No-Poach Agreement between the companies.

67.     According to a 2010 internal communication, the No-Poach Agreement even foreclosed the consideration of unsolicited applicants employed by Wabtec or KBC without prior approval of the other firm.[64] Specifically, a senior executive at KBC stated that he would not even

---

[61] Dept. of Justice Office of Public Affairs, *Justice Department Requires Knorr and Wabtec to Terminate Unlawful Agreement Not to Compete for Employees* (Apr. 3, 2018), https://www.justice.gov/opa/pr/justice-department-requires-knorr-and-wabtec-terminate-unlawful-agreements-not-compete.
[62] Competitive Impact Statement, *supra* n.1, at 6.
[63] *Id.*
[64] Complaint, *supra* n. 30, at 7-8.

consider a Wabtec candidate who applied to KBC without the permission of his counterpart at Wabtec.[65]

68.     Moreover, Wabtec and Knorr's No-Poach Agreement also reached the companies' U.S. rail equipment businesses. In July 2012, for example, a senior executive at NYAB informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the No-Poach Agreement between Wabtec and Knorr.[66]

### 2.     The Knorr-Faiveley Agreement.

69.     Beginning no later than 2011, senior executives at KBC and Faiveley Transport North America reached an express No-Poach Agreement that involved commitments to contact one another before pursuing an employee of the other company.[67] In October 2011, a senior executive at KBC explained in an e-mail to a high-level executive at Knorr that he had a discussion with an executive at Faiveley that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job."[68]

70.     In or about 2012, a senior executive at KBC discussed the companies' No-Poach Agreement with an executive at Faiveley at a trade show in Berlin, Germany.[69] Subsequently, senior executives at the companies enforced the No-Poach Agreement through direct communications with each other. For example, in October 2012, executives at Faiveley stated in an internal communication that they were required to contact KBC before hiring a U.S. train brake engineer.[70]

---

[65] *Id.* at 8.
[66] *Id.*
[67] *Id.*
[68] *Id.* at 8-9.
[69] *Id.* at 9.
[70] *Id.* at 9.

71.     The companies continued their No-Poach Agreement until at least 2015. After Wabtec announced its proposed acquisition of Faiveley Transport S.A. in July 2015, a high-level Knorr executive directed the company's recruiters in the United States and other jurisdictions to raid Faiveley for high-potential employees, temporarily "cheating" on the No-Poach Agreement.[71]

### 3.     The Wabtec-Faiveley Agreement.

72.     Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley entered into a No-Poach Agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.[72] Wabtec Passenger Transit and Faiveley executives actively managed and enforced the agreement. For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley without first getting permission from Faiveley executives.[73] In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley]."[74] One month later, a Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley's employees was "off the table" due to the agreement with Faiveley.

73.     In July 2015, Wabtec and Faiveley Transport S.A. publicly announced their intent to merge. Wabtec acquired majority ownership of Faiveley Transport S.A. on November 30, 2016. Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

---

[71] *Id.*
[72] *Id.*
[73] *Id.* at 10.
[74] *Id.*

### H.    The Investigation by the DOJ Antitrust Division

#### 1.    Government Announces No-Poach Agreements Are an Enforcement Priority

74.    In October 2016, the DOJ and the Federal Trade Commission (the "FTC") jointly issued Antitrust Guidance for Human Resource Professionals (the "Antitrust HR Guidance"), indicating a renewed focus on no-poach agreements and other restraints on the labor market. The guidance reminds competitors that,

> the DOJ intends to proceed criminally against naked wage-fixing or no-poaching agreements. These types of agreements eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct. Accordingly, the DOJ will criminally investigate allegations that employers have agreed among themselves on employee compensation or not to solicit or hire each other's employees.[75]

The Guidance also warns that, "Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws."[76]

75.    In a press release that accompanied the Antitrust HR Guidance, Acting Assistant Attorney General ("AAG") for the Antitrust Division Renata Hesse stated, "Antitrust violations in the employment arena can greatly harm employees and impact earnings over the course of their entire careers." FTC Chairwoman Edith Ramirez stated, "Competition is essential to well-functioning markets, and job markets are no exception. These guidelines . . . will help employees reap the benefits of a competitive market for their services." [77]

---

[75] Dept. of Justice and Fed. Trade Comm., *Antitrust Guidance for Human Resource Professionals*, 4 (Oct. 2016), https://www.justice.gov/atr/file/903511/download.
[76] *Id.*
[77] Fed. Trade Comm., *FTC and DOJ Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation* (Oct. 20, 2016), https://www.ftc.gov/news-events/press-releases/2016/10/ftc-doj-release-guidance-human-resource-professionals-how.

76.     The emphasis on no-poach agreements has continued under both the Obama and Trump administrations. In prepared remarks to the American Bar Association Section of Antitrust Law on November 17, 2016, Hesse stated, "[n]aked 'no-poaching' agreements or agreements to fix wages stamp out competition just like agreements to allocate customers or to fix product prices, violations of the law that the division has traditionally investigated criminally and prosecuted as hardcore cartel conduct."[78]

77.     On September 12, 2017, Acting Assistant Attorney General Andrew Finch gave remarks before the Global Antitrust Enforcement Symposium, and stated:

> The Guidelines cautioned that naked agreements among employers not to recruit certain employees, or not to compete on employee compensation, are per se illegal and may thereafter be prosecuted criminally. . . . Companies that sell different products or services might not compete for consumers, but they still can compete for workers. . . . Your clients should be on notice that a business across the street from them—or, for that matter, across the country—might not be a competitor in the sale of any product or service, but it might still be a competitor for certain types of employees such that a naked no-poaching agreement, or wage-fixing agreement, between them would receive per se condemnation.[79]

78.     On January 19, 2018, AAG of the Antitrust Division Makan Delrahim announced that the DOJ would bring its first criminal cases involving alleged no-poaching agreements in violation of the Sherman Act in the coming months and warned that if such activity "has not been stopped and continued from the time when the DOJ's [new no-poaching] policy was made" in October 2016, the DOJ would "treat that [conduct] as criminal."[80]

---

[78] Dept. of Justice, *Acting Ass't Attorney General Renata Hesse of the Antitrust Div. Delivers Remarks at the Amer. Bar Assoc. Fall Forum* (Nov. 17, 2016), https://www.justice.gov/opa/speech/acting-assistant-attorney-general-renata-hesse-antitrust-division-delivers-remarks-0.

[79] Dept. of Justice, *Acting Ass't Attorney General Andrew Finch Delivers Remarks at Global Antitrust Enforcement Symposium* (Sept. 12, 2017), https://www.justice.gov/opa/speech/acting-assistant-attorney-general-andrew-finch-delivers-remarks-global-antitrust.

[80] *See* M. Perlman, *Delrahim Says Criminal No-Poach Cases Are In The Works*, Law360, Jan. 19, 2018, https://www.law360.com/articles/1003788/delrahim-says-criminal-no-poach-cases-are-in-the-works.

### 2. The DOJ Investigation Into the Rail Industry's No Poach Agreements

79.    In July 2015, Wabtec announced its intent to acquire Faiveley.  During its review of the Wabtec-Faiveley merger, the Antitrust Division of the DOJ detected the No-Poach Agreements between the companies. A separate investigation was thereafter launched and on April 3, 2018, the DOJ filed a complaint in federal court against Defendants Knorr and Wabtec.[81]

80.    The DOJ found that the companies' agreements unlawfully allocated employees among the companies, "disrupted the normal bargaining and price-setting mechanisms that apply in the labor market," and were *per se* illegal under the Sherman Act. The DOJ also concluded that Defendants' agreements "were naked restraints on competition for employees and were not reasonably necessary to any separate legitimate business transaction or collaboration between the firms." The DOJ emphasized that the settlement agreement with Defendants covered a restraint on soliciting, recruiting, hiring without approval, or otherwise competing for various employees, including "project managers, engineers, executives, business unit heads, and corporate officers." This restraint deprived workers of "competitively important information that they could have leveraged to bargain for better job opportunities in terms of employment."

81.    On April 3, 2018, the DOJ announced its settlement with Knorr and Wabtec after discovering that the companies "had for years maintained unlawful agreements not to compete with each other's employees." In connection with its settlement announcement, AAG Delrahim stated that, "[t]oday's complaint is part of a broader investigation by the Antitrust Division into naked agreements not to compete for employees—generally referred to as no-poach agreements."[82]

---

[81] Complaint, *supra* n. 30.
[82] DOJ Press Release, *supra* n. 61.

82.     The DOJ also filed a stipulated proposed final judgment, in which Wabtec and Knorr agreed that the DOJ's complaint "state[d] a claim upon which relief may be granted against the Defendants under Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1."

83.     Under the terms of the settlement, Wabtec and Knorr are "prohibited from entering, maintaining, or enforcing No-Poach Agreements with any other companies" going forward. The proposed stipulation and order by the DOJ covers both parent companies Wabtec and Knorr, and their successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, directors, officers, managers, agents, and employees.

84.     The DOJ noted that it "pursued the agreements at issue in the Complaint by civil action rather than as a criminal prosecution because the United States uncovered and began investigating the agreements, and the Defendants terminated them before the United States had announced its intent to proceed criminally against such agreements."

## PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

85.     By entering the No-Poach Conspiracy, Defendants intended to and did suppress Plaintiffs' and the Class's compensation and restricted competition in the labor market in which Plaintiffs and the other Class members sold their services. It did so through a scheme that eliminated solicitation, a significant form of competition to attract skilled labor in the U.S. rail industry.

86.     Cold calling has a significant beneficial impact for individual employees' compensation. Specifically, solicitation from rival employers may include offers that exceed an employee's salary, allowing them to receive a higher salary by either changing employers or negotiating increased compensation from the current employer. Employees solicited from other industry players may also inform other employees of the offer they received, spreading information

Case 2:05-mc-02025    Document 923    Filed 07/18/18    Page 26 of 34

about higher salary levels that can similarly lead to movement or negotiation by those other employees with their current employer or others.

87.    Active solicitation similarly affects compensation practices by employers. A firm that solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offer to make themselves more competitive. Similarly, through solicitation, companies would be privy to information indicating whether their offered compensation is enough to keep their current employees and may cause employers to preemptively increase their employees' compensation in order to reduce their competitors' appeal.

88.    Information about higher salaries and benefits provided by recruiters for one firm to employees of another naturally would increase employee compensation. Restraining active recruitment made higher paying opportunities less transparent to workers and thus allowed employers to keep salaries artificially suppressed. This anticompetitive behavior did not just affect particular individuals who would have been solicited, but all workers and Class members employed by the Defendants.

89.    Labor competition in the rail and freight industry is nationwide. Defendants considered each other's compensation packages to be competitively relevant regardless of location, and many Class members may have moved between states to pursue employment opportunities.

90.    Therefore, Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

(the "Class") pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3). The Class is

defined as follows:

> All persons employed by Defendants or their subsidiaries at any
> time from 2009 to the present. Excluded from the Class are
> personnel in the human resources and recruiting departments of the
> Defendants and employees hired outside of the United States to
> work outside of the United States. The "United States" includes all
> fifty states, the District of Columbia, and all U.S. territories.

92.     Plaintiffs do not know the exact number of members of the Class, because such

information is solely in Defendants' possession, custody or control. But on information and belief,

the Class contains hundreds, if not thousands, of members, as each Defendant employed hundreds

or thousands of employees each year. The Class is so numerous that individual joinder of all

members is impracticable.

93.     The Class is ascertainable either from Defendants' records or through self-

identification in the claims process.

94.     Common questions of law and fact exist as to all members of the Class. This is

particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was

generally applicable to all the members of the Class, hereby making appropriate relief with respect

to the Class as a whole. Such questions of law and fact common to the Class include, but are not

limited to:

> a.      Whether Defendants agreed not to solicit each other's employees;
>
> b.      Whether Defendants exchanged competitively sensitive salary information
> and agreed upon compensation ranges for positions held by Class members;
>
> c.      Whether such agreements were *per se* violations of the Sherman Act;
>
> d.      Whether Defendants fraudulently concealed their misconduct;

e.      Whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;

f.      Whether Plaintiffs and the other Class members suffered injury as a result of Defendants' agreements;

g.      Whether any such injury constitutes antitrust injury;

h.      The nature and scope of injunctive relief necessary to restore a competitive market; and

i.      The measure of damages suffered by Plaintiffs and the Class.

95.     Plaintiffs' claims are typical of the claims of the members of the Class as they arise out of the same course of conduct and the same legal theories, and they challenge Defendants' conduct with respect to the Class as a whole. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

96.     Plaintiffs are represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

97.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

98.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might

not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

99.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

100.     Defendants' No-Poach Agreements caused Class Members damages in an ascertainable amount to be established at trial.

101.     Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the Class.

## EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

102.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful acts. Throughout most of the Class period and not until the DOJ's settlement with Defendants became public on April 3, 2018, Plaintiffs and members of the Class had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of due diligence, the existence of the Defendants' wrongdoing.

103.     The statute of limitations is also suspended pursuant to 15 U.S.C. § 16(i).

## A.     Defendants Took Affirmative Steps to Mislead Class Members and Conceal the Conspiracy

104.     Defendants took many active steps to conceal the conspiracy from Plaintiffs and Class members. They guarded their conspiratorial communications to keep them from coming to light, and they affirmatively misled Plaintiffs and the Class as to what they did to retain or find employees. They made these misstatements in a variety of forms, including direct communications

with Class members, codes of business conduct issued to Class members, and even public filings with regulatory bodies such as the Securities and Exchange Commission (the "SEC").

105.    Specifically, as part of Wabtec's 2017 Form 10-K, filed with the SEC, Wabtec listed Knorr as its "main competitor" while reporting to shareholders that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards," including conducting "its business activities within the laws of host countries in which the Company operates."[83] Its list of "principal competitors" includes NYAB and Knorr.

106.    Wabtec's Code of Business Conduct and Ethics contains a section titled "Antitrust / Competition laws," which provides that it "competes independently in the marketplace" and instructs the reader, "[y]ou cannot engage in any understandings or agreements with competitors to restrain trade and must avoid the appearance of such conduct."[84] The Code "applies to all Wabtec directors, officers and employees, including individuals employed at domestic and foreign subsidiaries and joint ventures controlled by the Company," as well as its agents.

107.    Similarly, Knorr's 2017 Annual Report refers to Wabtec as its "principal competitor."[85]

108.    Knorr's Code of Conduct applies "to all employees of the Knorr-Bremse Group worldwide" and expressly expects "the entire workforce not only to observe internal regulations but also to observe the law."[86] It provides that, "it is not permitted to conclude agreements with

---

[83] *See* Wabtec 2017 10-K, *supra* n.6.
[84] Wabtec Corp., *Wabtec Code of Business Conduct and Ethics*, https://www.wabtec.com/uploads/pdf/CodeofConduct.pdf.
[85] Knorr-Bremse, *Annual Report 2017*, *supra* n. 40.
[86] Knorr-Bremse, *Code of Conduct*, 1, http://www.knorr-bremse.com/media/documents/group/compliance_1/02_KB_Code_of_Conduct_English_November_2012.pdf.

competitors on prices, margins, costs, volumes, production performance, tendering, sales or other factors that influence the behavior of the company; non-competition, false tendering; or apportionment out of customers, markets, areas, production programs, etc."

109.   Despite these public statements, behind closed doors, Defendants engaged in discrete agreements that would not have put Plaintiffs or the Class on inquiry notice that there was a conspiracy to restrict competition for Class members' services through anti-solicitation agreements and to fix the compensation of Class members. Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection. Defendants relied on non-public methods of communication in order to prevent dissemination of the conspiracy beyond the individuals involved in the execution of the unlawful agreements. As discussed above, Defendants' discussions often occurred through direct conversations with each other's senior executives or through email exchanges between senior executives and/or recruiters, information to which Class members were not privy.

110.   Upon information and belief, to actively cover up their conspiracy and prevent Plaintiffs and Class members from learning that their compensation was suppressed through collusion, Defendants routinely provided pre-textual, incomplete, or materially false and misleading explanations for compensation decisions and recruiting and retention practices affected by the conspiracy.

**B.**   **Plaintiffs and Class Members Lacked Actual or Constructive Knowledge of the Conspiracy during the Class Period**

111.   Because of Defendants' concealment efforts described above, Class members had no reason to know Defendants had conspired to suppress compensation until April 3, 2018, when the DOJ announced it had charged Defendants with a *per se* violation of the Sherman Act in connection with the No-Poaching Agreements and settled with them.

112.    As a result of Defendants' fraudulent concealment of their conspiracy, the running

of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class

members have as a result of the anticompetitive and unlawful conduct alleged herein.

### INTERSTATE COMMERCE

113.    During the Class Period, Defendants and their subsidiaries employed Plaintiffs

and other Class members in at least Pennsylvania, New York, South Carolina and Maryland.

114.    Competition in the market for the labor of members of the putative class extends

nationwide. Defendants hire employees from states other than the state in which the position is

located, and consider the salaries, benefits and other terms of employment offered by

competitors in other states when making offers of employment.

115.    Defendants' No-Poach Conspiracy substantially affected interstate commerce

throughout the United States, and caused antitrust injury to members of the Class throughout the

United States.

### CLAIM FOR RELIEF
**For Violation of Sections 1 and 3 of the Sherman Act**
**(15 U.S.C. § 1, 3)**

116.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully

set forth herein.

117.    Defendants, by and through their officers, directors, employees, or other

representatives, have entered into an unlawful agreement, combination and conspiracy in restraint

of trade, in violation of 15 U.S.C. §§ 1, 3. Specifically, Defendants agreed to restrict competition

for Class members' services through refraining from solicitation of each other's employees,

thereby fixing the compensation ranges of Class members, all with the purpose and effect of

suppressing Class members' compensation and restraining competition in the market for class members' services.

118.    Defendants' conspiracy injured Plaintiffs and other Class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

119.    Defendants' conspiracy is a per se violation of Sections 1 and 3 of the Sherman Act.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs prays for relief and judgment as follows:

A.    For an order certifying this lawsuit as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    For a judgment awarding Plaintiffs and the Class treble damages, as well as punitive or exemplary damages, against Defendants for their violations of the Sherman Act, together with pre-judgment and post-judgment interest at the maximum rate allowable by law or allowed in equity;

C.    An order imposing a permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or engaging in unlawful communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

D.    For an order awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

Dated: July 18, 2018

By: *s/ Joel R. Hurt*
    Joel R. Hurt, Esquire
    PA ID No. 85841

Ruairi McDonnell, Esquire, PA ID No. 316998
**Feinstein Doyle Payne & Kravec, LLC**
429 Fourth Avenue
Law & Finance Building, Suite 1300
Pittsburgh, PA 15219
Tel.: (412) 281-8400
Fax: (412) 281-1007
*jhurt@fdpklaw.com*
*rmcdonnell@fdpklaw.com*

M. Stephen Dampier, Esquire
AL Bar ID No. 6125A55M
**The Dampier Law Firm P.C.**
55 N. Section Street
Fairhope, AL 36532
Tel.: (251) 929-0900
Fax: (251) 929-0800
*stevedampier@dampierlaw.com*